This Opinion is a
Precedent of the TTAB

Mailed: November 21, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

‗‗‗‗

Trademark Trial and Appeal Board

‗‗‗‗

*In re Black Card LLC*

‗‗‗‗

Serial No. 90641690

‗‗‗‗

Susan Stabe, Courtney Thornton and Jóna Mays
of Troutman Pepper Hamilton Sanders LLP,
    for Black Card LLC.

Brian Pino, Trademark Examining Attorney, Law Office 114,
    Nicole Nguyen, Managing Attorney.

‗‗‗‗

Before Wellington, Lynch and Hudis,
    Administrative Trademark Judges.

Opinion by Hudis, Administrative Trademark Judge:

Black Card LLC ("Applicant") seeks registration on the Principal Register of the

standard character mark FOLLOW THE LEADER for:

> Promoting the sale of goods and services of others by awarding
> incentives to consumers for credit card use; providing information about
> and making referrals in the field of consumer products and services for
> retail services concerning products, services, events, activities,
> attractions and facilities in particular geographic locations, in
> International Class 35;
>
> Financial services for charge cards, credit cards and debit cards, namely,
> issuing of charge cards, credit cards, and debit cards and transaction
> processing services for charge cards, credit cards, and debit cards; credit
> card payment processing services; computerized credit card services,

namely, providing electronic processing of credit card transactions and electronic payments via a global computer network; evaluation of the credit worthiness of companies and private individuals; and financial risk management services; providing financial information in the fields of foreign currency; providing cash and other rebates for credit card use as part of a customer loyalty program, in International Class 36;

Providing travel information; providing flight arrival and departure information; arranging for travel visas, passports and travel documents for persons traveling abroad; making car rental and limousine reservations for others; arranging travel tours for others, namely, arranging of transportation for travel tours; providing concierge services for travelers, namely, making travel arrangements, in International Class 39;

Language translation services; arranging for ticket reservations for entertainment, sporting and cultural events; providing advice to travelers on entertainment, cultural and sporting events; arranging travel tours for others, namely, arranging travel tours for others, namely, arranging sightseeing, cultural activities, cruises, city, natural park, and countryside tours, in International Class 41;

Providing advice to travelers on hotels and restaurants; making reservations for travel, namely, booking temporary accommodations for travelers; making reservations and bookings for others for accommodations and meals at health spas, in International Class 43;

Making reservations and bookings for others at beauty salons and spas and for physical and beauty treatments at health spas, in International Class 44; and

Personal concierge services for others comprised of making requested personal and social arrangements and reservations, personal shopping services, personal gift selection and gift reminder services for others, and providing customer specific information to meet individual needs, all rendered in business establishments, office buildings, airports, hotels, residential complexes and homes, in International Class 45.[1]

The Trademark Examining Attorney refused registration under Trademark Act Sections 1, 2, 3, and 45, 15 U.S.C. §§ 1051-1053 and 1127, on the ground that Applicant's proposed mark, as applied to the services identified in all classes of the

---

[1] Application Serial No. 90641690 was filed on April 13, 2021, under Trademark Act Section 1(b), 15 U.S.C. § 1051(b), based upon Applicant's allegation of a bona fide intention to use the mark in commerce for all classes of services.

Application, fails to function as a mark to indicate the source of Applicant's services and distinguish them from others, because it is a commonplace term, message, or expression, widely-used by a variety of sources, which merely conveys an ordinary, familiar, or generally understood concept or sentiment. The Examining Attorney also refused registration of Applicant's proposed mark as to the services in International Class 41, on the ground that the identification of services in that class is indefinite and must be clarified. Trademark Rule 2.32(a)(6), 37 C.F.R. § 2.32(a)(6).

When the refusals were made final, Applicant appealed and requested reconsideration. After the Examining Attorney denied the request for reconsideration, the appeal was resumed. Applicant and the Examining Attorney filed briefs.[2]

The refusal to register under Trademark Act Sections 1, 2, 3, and 45 is reversed. We affirm the refusal to register Applicant's proposed mark in International Class 41 due to the indefinite identification of services in that class.

## I.   Evidentiary Issue

Before proceeding to the merits of the refusals, we address an evidentiary matter. Applicant attached to its appeal brief 100 pages of material. Much of this content

---

[2] References to the briefs and the appeal record refer to the Board's TTABVUE docket system. Before the TTABVUE designation is the docket entry number; and after this designation are the page references, if applicable. Applicant's Appeal Brief is found in the record at 6 TTABVUE; the Examining Attorney's Brief at 8 TTABVUE. Page references herein to the application record refer to the online database of the USPTO's Trademark Status & Document Retrieval ("TSDR") system. All citations to documents contained in the TSDR database are to the downloadable .pdf versions of the documents in the USPTO TSDR Case Viewer.

appears have been made of record during prosecution, but some of it may not have been.

The Board will not expend its valuable resources in an attempt to distinguish which, if any, of this material is already properly of record. If this material was not made of record during prosecution, we note that, under Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d), the record in an application should be complete before the filing of an appeal. *See also In re tapio GmbH*, 2020 USPQ2d 11387, at *3-4 (TTAB 2020). If this material already was made of record during prosecution, it should not have been refiled with the brief; the Board discourages the practice of filing evidence again with a party's appeal brief. *In re Lorillard Licensing Co.*, 99 USPQ2d 1312, 1315 (TTAB 2011); *In re SL&E Training Stable Inc.*, 88 USPQ2d 1216, 1220 n.9 (TTAB 2008) (attaching as exhibits to brief material already of record requires Board to determine whether attachments had been properly made of record and adds to the bulk of the file); *In re Thor Tech Inc.*, 85 USPQ2d 1474, 1475 n.3 (TTAB 2007) (attaching evidence from record to briefs is duplicative and is unnecessary). Either way, in this decision we rely solely on the evidence Applicant and the Examining Attorney timely made of record during prosecution.

## II.   Applicable Law: Failure to Function – Widely Used Commonplace Expression

Sections 1, 2, 3, and 45 of the Trademark Act provide the statutory basis for refusal to register subject matter that does not function as a trademark or service mark. 15 U.S.C. §§ 1051, 1052, 1053, and 1127. Specifically:

- Sections 1 and 2 provide for an application and the registration on the Principal Register of trademarks by which the goods of the applicant may be distinguished from the goods of others;

- Section 3 provides that "[s]ubject to the provisions relating to the registration of trademarks, so far as they are applicable, service marks shall be registrable, in the same manner and with the same effect as are trademarks…. Applications and procedure … [for service marks are intended to] conform as nearly as practicable to those prescribed for the registration of trademarks."

- Section 45 defines a "service mark" in pertinent part, as "any word, name, symbol, or device, or any combination thereof … used by a person, or … which a person has a bona fide intention to use in commerce and applies to register on the principal register to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown."

A threshold question in evaluating an application to register a trademark or service mark is thus whether the proposed mark satisfies these definitional requirements. As the Supreme Court has recognized, "the lead criterion for registration is that the mark in fact serve as a 'trademark' to identify and distinguish goods [or services]." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 143 S. Ct. 1578, 2023 USPQ2d 677, at *5 (2023) (cleaned up) (also explaining that "a trademark is not a trademark unless it identifies a product's source (this is a Nike) and distinguishes that source from others (not any other sneaker brand)"); *see also In re Vox Populi Registry, Ltd.*, 25 F.4th 1348, 2022 USPQ2d 115, at *2 (Fed. Cir. 2022); *In re Brunetti*, 2022 USPQ2d 764, at *9 (TTAB 2022) (The USPTO "is statutorily constrained to register matter on the Principal Register if and only if it functions as a mark."). "Matter that does not operate to indicate the source or origin of the identified … services and distinguish them from those of others does not meet the statutory definition of a … [service mark] and may not be registered …." *In re Greenwood*,

2020 USPQ2d 11439, at *2 (TTAB 2020) (quoting *In re AC Webconnecting Holding B.V.*, 2020 USPQ2d 11048, at *2-3 (TTAB 2020)).

Not every designation adopted with the intention that it perform a service mark function necessarily accomplishes that purpose. *In re Tex. with Love, LLC*, 2020 USPQ2d 11290, at *2-3 (TTAB 2020) (quoting *In re Pro-Line Corp.*, 28 USPQ2d 1141, 1142 (TTAB 1993) ("Mere intent that a phrase function as a … [service mark] is not enough in and of itself to make it a … [service mark].")). "The critical inquiry in determining whether a proposed mark functions as a … [service mark] is how the relevant public perceives the term sought to be registered." *Univ. of Ky. v. 40-0, LLC*, 2021 USPQ2d 253, at *25 (TTAB 2021) (citing *In re Greenwood*, 2020 USPQ2d 11439, at *2); *see also In re Volvo Cars of N. Am. Inc.*, 46 USPQ2d 1455, 1459 (TTAB 1998) ("A critical element in determining whether a term or phrase is a trademark is the impression the term or phrase makes on the relevant public.").

If the evidence shows the proposed mark would not be perceived by consumers as identifying the source of the applied-for goods or services, it is not registrable. For example, evidence may show the proposed mark "is a common term or phrase that consumers of the … services identified in the application are accustomed to seeing used by various sources to convey ordinary, familiar, or generally understood concepts or sentiments." *In re Brunetti*, 2022 USPQ2d 764, at *12. "The more commonly a phrase is used, the less likely that the public will use it to identify only one source and the less likely that it will be recognized by purchasers as a … [service mark]." *Id.* (citing *In re Eagle Crest, Inc.*, 96 USPQ2d 1227, 1229 (TTAB 2010)).

"Where the evidence suggests that the ordinary consumer would take the words at their ordinary meaning rather than read into them some special meaning distinguishing … [services] from similar … [services] of other[s], then the words fail to function as a mark." *In re Ocean Tech., Inc.*, 2019 USPQ2d 450686, at \*3 (TTAB 2019) (internal punctuation omitted).

On the other hand, not every common term or phrase warrants refusal on failure to function grounds. The refusal is strictly dependent on the evidence presented to show how consumers would perceive the proposed mark. The totality of the evidence must be sufficient to show that the phrase sought to be registered is used in such a way that it cannot be attributed to a single source of the goods or services at issue. *Cf. In re Lizzo LLC*, 2023 USPQ2d 139, at \*39 (TTAB 2023) ("[T]he totality of the evidence of record … undercuts a finding that 100% THAT BITCH is a commonplace expression, so widely used by third parties that consumers would not perceive it as indicating the source of the goods identified thereby.").

To determine whether a phrase sought to be registered functions as a source indicator, we look to evidence showing how the phrase is used in the marketplace by Applicant and by others. *See In re Tex. with Love*, 2020 USPQ2d 11290, at \*2 and \*7 (quoting *In re Eagle Crest*, 96 USPQ2d at 1229, and noting that "widespread use of a term or phrase may be enough to render it incapable of functioning as a trademark, regardless of the type of message."). Evidence of use of a phrase by third parties in connection with the particular goods or services at issue can support a finding that the phrase conveys a commonly understood sentiment and does not serve to signify

source in relation to those goods or services. *In re Team Jesus LLC*, 2020 USPQ2d 11489, \*5 (TTAB 2020) (relying in part on evidence showing TEAM JESUS on t-shirts to find that the phrase had a meaning in relation to clothing); *D.C. One Wholesaler, Inc. v. Chien*, 120 USPQ2d 1710, 1716 (TTAB 2016) (widespread ornamental use of I ♥ DC was indicative of common understanding of the term for t-shirts and other memorabilia). Likewise, evidence that a phrase is used to convey a single, common sentiment or meaning across a variety of goods or services can support a finding that consumers will view the phrase as conveying that same sentiment or meaning regardless of the goods or services in connection with which it is used.

When assessing such evidence, the focus is not only on common use of the phrase, but on whether the various uses inform how the phrase would be perceived by consumers of the identified goods or services. *See, e.g.*, *In re Brunetti*, 2022 USPQ2d 764, at \*36 ("Mere commonality ... is not the test."); *In re Wal-Mart Stores, Inc.*, 129 USPQ2d 1148, 1156 (TTAB 2019) (evidence of widespread usage of the phrase INVESTING IN AMERICAN JOBS across various industries, media articles, and blogs, demonstrated a common meaning that applied to the identified services of "promoting public awareness for goods made or assembled by American workers"); *In re Ocean Tech.,* 2019 USPQ2d 450686, at \*3. The evidence must be "competent to suggest that upon encountering [the applied for slogan] prospective purchasers familiar with such widespread non-trademark use are unlikely to consider it to indicate the source of Applicant's [services]." *In re DePorter*, 129 USPQ2d 1298, 1302

(TTAB 2019) (evidence of third-party use demonstrated a consistent meaning related to the Chicago Cubs' World Series win after a 108-year drought).

When "there are no limitations on the channels of trade or classes of consumers of the … [services] identified in the application, the relevant consuming public comprises all potential purchasers of … [such services]." *Univ. of Ky. v. 40-0, LLC,* 2021 USPQ2d 253, at *25 (citing *In re Mayweather Promotions,* 2020 USPQ2d 11298, at *3 (TTAB 2020)). "[E]vidence of the public's perception may be obtained from 'any competent source, such as consumer surveys, dictionaries, newspapers and other publications.'" *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 114 USPQ2d 1827, 1833 (Fed. Cir. 2015) (quoting *In re Northland Aluminum Prods., Inc.*, 777 F.2d 1556, 227 USPQ 961, 963 (Fed. Cir. 1985)). "It is well settled that articles obtained from the Internet, websites, and blog posts are admissible as evidence of information available to the consuming public and of the way in which a term is being used or would be understood by the relevant public." *In re Wal-Mart Stores*, 129 USPQ2d at 1156.

### III. Failure to Function: the Examining Attorney's Arguments and Evidence

The Examining Attorney argues:

> The … evidence … shows that the term or expression FOLLOW THE LEADER is commonly used to encourage customers to follow the leader in a particular field and conveys that the applicant is the leader in the services listed in the application and should be followed because of this alleged fact. … Because consumers are accustomed to seeing FOLLOW THE LEADER commonly used in everyday speech by many different sources, they would not perceive FOLLOW THE LEADER as a mark identifying the source of applicant's

services but rather as only conveying an informational message that all competitors can use.[3]

To support this position, the Examining Attorney made of record evidence from the Internet comprised of a dictionary entry, articles, blogs, company websites, consumers goods, and other materials showing use of FOLLOW THE LEADER in the following ways and contexts:

### A. Children's Game

- **Follow-the-leader** – a children's game in which everyone follows and does what the child who is chosen to be the leader does. (merriam-webster.com).[4]

- How to play **Follow the Leader** game – "One player, the Leader, begins moving around with actions that the rest of the players must mimic. Anything - including wildly flailing his hands or furiously scratching his head - what the leader does, the others must follow. Those players who disobey, or lag behind the leader's motions are out of the game. The last person standing becomes the new Leader." (considerable.com, January 28, 2019).[5]

- **Follow the Leader** Game – "**Follow the Leader** is a fun children's game that can be played with kids of all ages. … Try and follow everything the leader does. Children line up in a line and do everything the leader of the line does. There is no winner or loser in the game of follow the leader. Children take turns leading and following." (fungameskidsplay.com, May 3, 2022).[6]

### B. Business Decision-making Principles Based on Actions of the Market Leader

- **Follow-the-Leader** Pricing – "**Follow-the-leader** pricing is a competitive pricing strategy where a business matches the prices and services of the market leader. That is, a company will follow the pricing of the largest player in the industry." (investopedia.com, September 29, 2019).[7]

- **Follow the Leader** – "Whenever a work achieves enough success, there will be imitators. … [T]his has the typical effect of flooding the market with a lot of

---

[3] Examining Attorney's Brief, 8 TTABVUE 8.

[4] Office Action of May 23, 2022, at 19-22.

[5] Office Action of May 23, 2022, at 23-25.

[6] Office Action of May 23, 2022, at 26-27.

[7] Office Action of October 25, 2021, at 7-10.

inferior works. But not always; sometimes they improve on the original, or find new approaches to it. … So why bother **following the leader** at all? Well, since the original being copied probably had something that made it successful, it's rare for the duplicates to fail completely. And once in a while, they can pay off big time. Some works actually manage to replicate much of the success of the leader, often by original elements that give the followers their own quality or, *even* more rarely, by highly derivative works that manage to maintain or *even* exceed the quality of the leader." (tvtropes.org, October 20, 2021).[8]

- Burger King's New Sandwich May Look Familiar to McDonald's Fans – "Playing **follow the leader** lets you make moves that make sense from a business perspective, but seem a little suspicious. Dunkin', for example, just seems to wait to see what works at Starbucks before offering its variation of that success … [T]hat has been the Dunkin' way and, it's a classic **follow-the-leader** strategy." (TheStreet.com, February 7, 2022).[9]

- **Follow-the-Leader** Strategy – "[D]ecisions and actions taken by a firm which chooses to follow the market leader as an alternative to challenging it, essentially reactive, **follow-the-leader** strategies, also known as 'me-too' strategies, minimi[z]e the risk of retaliation which might result from an attack, direct or indirect, on the market leader's share." (monash.com, May 5, 2022).[10]

- Amazon Latest Megacap To Join Stock Split Squad – "Amazon unveiled a 20-for-1 stock split late on Wednesday, only weeks after megacap peer Alphabet did the same. Other companies that have split their shares since 2020 include Apple, Tesla and Nvidia. 'It's a little bit of **follow the leader**,' said Chuck Carlson, chief executive officer at Horizon Investment Services in Hammond, Indiana. 'You had Apple, you had Tesla, and just recently you had Alphabet.'" (International Business Times News, March 10, 2022).[11]

## C.     Business Leadership Principles

- **Follow The Leader**: When A CEO Resigns, The CFO Is Likely To Exit Within Two Years – "When a chief executive departs, the head of finance often follows, and in quick succession …. Part of the reason for this trend … is the strong connection CFOs share with their CEOs …." (forbes.com, May 5, 2021).[12]

- When "**Follow the Leader**" Is Bad for the Team – "When a leader has held significant control for a long period of time, or there isn't any greater authority to dictate (and support) power-sharing this distracting and inefficient behavior

---

[8] Office Action of October 25, 2021, at 24-27.

[9] Office Action of May 23, 2022, at 10-11.

[10] Office Action of May 23, 2022, at 37-38.

[11] Office Action of May 23, 2022, at 12-13.

[12] Office Action of October 25, 2021, at 14-17.

can occur in any organization no matter how small or ostensibly informal." (lizkislik.com, March 29, 2011).[13]

- **Follow the Leader**, Leader Capital Corp. – "Since 2005, Leader Capital Corp. has generated a solid history of proven investment results and financial expertise. Specializing in fixed income investments, Leader Capital is dedicated to optimizing returns and managing the risk versus reward relationship inherent to every investment." (leadercapital.com, June 16, 2021).[14]

- **Follow the Leader** – business journalist Farnoosh Torabi interviews with successful entrepreneurs and industry leaders, so that viewers and listeners can possibly emulate their successes. (Amazon.com, October 20, 2021; IMDb.com, May 5, 2022).[15]

### D. Information regarding Guided Travel Tours

- **Follow the leader**? On a guided trip, drop a bundle or a bit - the choice is yours – "Some people can drop money without bothering to weigh the options. I'm not one of them. I like to window-shop in glossy travel catalogs, but I rarely go on guided trips. They're just too expensive …. I can't help but think about what else I could do with that much money. … And yet, not everyone wants the hassle of organizing a trip." (midwestweekends.com, October 20, 2021).[16]

- 5 tips to get ready for a Boat Bike Tours holiday – **5. Follow the leader** – perks of a fully-guided tour – "Is it your first cycling trip? Then make your life easier by going on a fully-guided tour. With these tours you're not obliged to ride with the tour leader and group all the time, so if you feel like exploring on your own you are welcome to do so. But if you like the extra information your tour leader can provide, or the interesting stops they know along the way, then come along. It's very relaxing just **following the leader**. Even if it's your second, third or seventh journey!" (boatbiketours.com, October 20, 2021).[17]

- The Italy4Real Story – "Meet the Team: "Rem has always had guiding and trip planning in his blood. His father taught him how to perfectly pack a car for the family's road trips and he began traveling solo before he was 15 years old. 'We don't offer anything we don't know,' said Malloy, who leads small group tours through Italy, World War II history tours of the Normandy landing beaches in

---

[13] Office Action of October 25, 2021, at 18-23.

[14] Office Action of October 25, 2021, at 28-30.

[15] Office Action of October 25, 2021, at 11-13; Office Action of May 23, 2022, at 31-36.

[16] Office Action of October 25, 2021, at 31-33.

[17] Office Action of October 25, 2021, at 34-37.

France and **follow the leader** driving tours featuring the world's fastest cars." (italy4real.com, October 20, 2021).[18]

### E.  Government and Political Leadership

- Letter to the editor: North Canton sends confusing message on local business – "Certainly not the entire City Council which performs their duties playing **follow the leader** under the control of city administration and at times under strict gag rules." (The Repository, April 20, 2022).[19]

- Trump Keeps Losing but the GOP Just Can't Quit Him – "They want to get rid of Adam Kinzinger and Mitt Romney and so on because they don't **follow the leader** in the way that they're supposed to." (The Daily Beast, April 8, 2022).[20]

- Saying 'no' when the White House wants a 'yes' – "**Follow the leader** or keep the faith is frequently the choice facing members of Congress when the White House drops its weight on them like a ton of political bricks." (The Jackson Sun, December 26, 2021).[21]

### F.  Personal Decision-making

- St. Philip's College is emblematic of how 2-year HBCUs are building tech-talent pipelines despite the odds –"'I get to watch her every day,' Loston said, motioning to Bowden's portrait. 'The model she gave us - she didn't just stop with her initial assignment, but she envisioned further in terms of going from a grammar school to now a two-year comprehensive institution. I do challenge all of the students to **follow the leader**.'" (San Antonio Business Journal, April 8, 2022).[22]

- Why do we look at car crashes? A psychology professor explains – "Folks see a bunch of other people doing stuff, we'll **follow the leader** and march along with them." (CBS – WNCT, February 8, 2022).[23]

- **Follow the Leader** –"**Follow the Leader**' is more than just a child's game. The newsstands are filled with magazines featuring leaders from the business world, entertainment and sports. Our young people mimic the lifestyles of role models that do not represent a godly influence." (tonyevans.org, May 3, 2022).[24]

---

[18] Office Action of October 25, 2021, at 38-42.

[19] Office Action of May 23, 2022, at 8.

[20] Office Action of May 23, 2022, at 10.

[21] Office Action of May 23, 2022, at 16-17.

[22] Office Action of May 23, 2022, at 17.

[23] Office Action of May 23, 2022, at 14-15.

[24] Office Action of May 23, 2022, at 28-30.

### G.    Name of Artwork

- **Follow the Leader** – "SPECIAL OFFER - Limited Edition Collection: Fearless in the lead position, with both enthusiasm and conviction seeming to waver in those bringing up the rear, a foursome of intrepid chinstrap penguins boldly go to their hillside rookery. Following many days at sea and having braved the tumultuous waters of the Antarctic Ocean fishing for krill, they make the long journey back to their young. Here, snowflakes masquerade as the brightest of stars, the daylight hours dimmed by the shadow of the hillside and brilliance of the frozen bay." (photo print of marching penguins, mangelsen.com, May 5, 2022).[25]

### H.    Ornamental Use on Consumer Items

- The Examining Attorney also made of record screenshots of websites advertising short and long-sleeved t-shirts, sweatshirts, mugs and pins, all emblazoned with FOLLOW THE LEADER, advertised for sale at the websites: redbubble.com, duckduckgo.com, amazon.com, lionnotsheep.com, prlog.com, and pinterest.com.[26]

## IV.    Failure to Function: Applicant's Evidence and Arguments

Applicant made of record the following evidence to overcome the refusal to register

Applicant's proposed mark as a widely-used commonplace expression:

- Ten registrations issued to third parties for the mark FOLLOW THE LEADER, all but one of which have been cancelled or allowed to expire.[27]

- An article titled "Resources for learning English (/english-resources/)," listing idioms, proverbs, and expressions that are a part of everyday English, including their meanings and uses.[28]

- Thirty-two third-party allowed applications and issued registrations for marks comprising what Applicant characterizes as common English idioms,[29] including for the phrases: LET THE GOOD TIMES ROLL, (IT'S A) PIECE OF CAKE, BETTER LATE THAN NEVER (two in Latin), HANG IN THERE, GET

---

[25] Office Action of May 23, 2022, at 52-53.

[26] Office Action of May 23, 2022, at 54-82.

[27] Cancelled Registration Nos. 4895546, 5074745, 934870, 1078600, 1453275, 1490449, 2681700, 3848227, 2799316; Office Action Response of April 22, 2022, at 14-21; Request for Reconsideration of November 23, 2022, at 56-57, 68-70, 87-98. Active Registration No. 6938615; Request for Reconsideration of November 23, 2022, at 68-70, duplicated at 100-02.

[28] Article, Request for Reconsideration of November 23, 2022, at 9-23.

[29] Applicant's Brief, 6 TTABVUE 13.

YOUR ACT TOGETHER, and LET'S ROLL; some of which have been abandoned, cancelled or allowed to expire (as applicable).[30]

From the evidence made of record, Applicant argues that: (1) Applicant's proposed mark has no generalized informational message,[31] (2) the USPTO's issuance of registrations for identical FOLLOW THE LEADER marks confirms that Applicant's proposed mark functions as a mark,[32] (3) there is no blanket rule that commonly used phrases are not registrable,[33] and (4) the failure-to-function refusal was premature because the Application was filed on an intent-to-use basis, and proof of how Applicant uses its mark has not yet been filed.[34]

## V.    Failure to Function: Discussion and Analysis

Although the evidence made of record by the Examining Attorney shows common use of FOLLOW THE LEADER in various contexts, it does not convince us that the phrase is incapable of functioning as a source identifier in the context of the services identified in the Application. The record need not necessarily include evidence of third-party use in connection with the specific services at issue for the evidence to support the failure to function refusal. *DePorter*, 129 USQP2d at 1302. However, the evidence must indicate that, in the context of the identified services (here, credit card

---

[30] Third-party applications and registrations, Request for Reconsideration of November 23, 2022, at 24-85. Among this group are cancelled Registration Nos. 2667915, 5087462, abandoned Application Serial Nos. 88574107, 97107802, 90783773, and pending Application Serial No. 90609340.

[31] Applicant's Brief, 6 TTABVUE 10-11.

[32] Applicant's Brief, 6 TTABVUE 12.

[33] Applicant's Brief, 6 TTABVUE 12-14.

[34] Applicant's Brief, 6 TTABVUE 14-15.

incentive program, credit card financial, travel information, ticket reservation, travel advisory, salon and spa reservation, and concierge services), FOLLOW THE LEADER would convey a generally understood sentiment or meaning to the consumers of these services such that they would not perceive it as signifying the source of the services.

The dictionary and internet evidence made of record indicates that FOLLOW THE LEADER is a children's game in which the players follow and do what the chosen leader does. The articles, blogs, and other evidence were submitted to show that FOLLOW THE LEADER is used by third parties in an informational and ornamental manner, but what they show is that the phrase may convey different meanings depending on the context. For example, FOLLOW THE LEADER can refer to business decisions made to align with the industry leader,[35] a manager's impact on employees or the business,[36] politicians' or government workers' often negatively portrayed allegiance or compliance with a political figure or political leadership,[37] tour groups being led by a tour guide,[38] or personal decision-making, whether based on following a role model or following the crowd.[39]

The evidence as a whole does not demonstrate use for services or in contexts from which we may reasonably infer that FOLLOW THE LEADER has a commonly

---

[35] Office Action of October 25, 2021, at 7-10, 24-27; Office Action of May 23, 2022, at 10-13, 37-38.

[36] Office Action of October 25, 2021, at 14-23.

[37] Office Action of May 23, 2022, at 8, 10, 16.

[38] Office Action of October 25, 2021, at 31-42.

[39] Office Action of May 23, 2022, at 16-17, 28-30

understood meaning applicable to Applicant's services that would render it incapable of being perceived as a source indicator for those services. Nor does the evidence here show that FOLLOW THE LEADER is a phrase used to convey a single, common sentiment or meaning across a variety of goods or services, such that consumers will view the phrase as conveying that same sentiment or meaning regardless of the goods or services in connection with which it is used.

The record here stands in contrast to the record in *In re Wal-Mart Stores*, 129 USPQ2d at 1153-56, where the record included evidence of the applicant's own use and common use of the phrase INVESTING IN AMERICAN JOBS across different industries and manufacturing contexts, which informed consumer perception of the phrase for the applicant's retail store services and promotional services for goods made or assembled by American workers.

From our review of the overall record, we are not convinced that FOLLOW THE LEADER is incapable of functioning as an indicator of the source of Applicant's services. The failure-to-function refusal, therefore, must be reversed.

## VI.    Indefinite Identification of Services

In the Office Action of May 23, 2022, the Examining Attorney issued a final requirement that Applicant provide a sufficiently definite identification of services in International Class 41.[40] In its Request for Reconsideration of November 23, 2022,

---

[40] Office Action of May 23, 2022, at 3-5.

Applicant submitted the following proposed amendment to its Identification of Services in Class 41:[41]

> Language translation services; arranging for ticket reservations for entertainment, sporting and cultural events; providing advice to travelers on entertainment, cultural and sporting events; ~~arranging travel tours for others;~~ **arranging travel tours for others, namely, arranging travel tours for others, namely, arranging sightseeing, cultural activities, cruises, city, natural park, and countryside tours.**

In the Denial of the Request for Reconsideration of December 13, 2022,[42] the Examining Attorney maintained the refusal to register for the services in Class 41 as being indefinite, stating:

> The identification of services in International Class 41 remains indefinite. For example, the sightseeing services could encompass transportation services in a different class. The applicant also duplicates the wording "arranging travel tours for others, namely,". The applicant may adopt the following identification if accurate in International Class 41:

> Language translation services; arranging for ticket reservations for entertainment, sporting and cultural events; providing advice to travelers on entertainment, cultural and sporting events; ~~arranging travel tours for others, namely,~~ arranging travel tours for others, namely, ticket reservation and booking for cultural events and arranging and conducting guided tours of cruise ships, natural parks, and the Tuscan countryside.

Applicant does not address at all the identification of services issue in its appeal brief. Its ability to contest the refusal to register the FOLLOW THE LEADER mark for the services in Class 41 on the ground that the articulated services are indefinite is therefore waived. *See In re Katch, LLC*, 2019 USPQ2d 233842, at *1-2 (TTAB 2019)

---

[41] Office Action Response of November 23, 2022, at 5 and 124-25.

[42] Denial of Request for Reconsideration of December 13, 2022, at 2.

(applicant who briefed only the refusal to register under Trademark Act Section 23(c) waived its appeal of the refusal to register under Trademark Act Sections 1, 2, 3 and 45); *In re Gibson Guitar Corp.*, 61 USPQ2d 1948, 1950 n.2 (TTAB 2001) (applicant did not, in its appeal brief, pursue the claim that its mark was inherently distinctive; therefore, this claim was not considered by Board). Because Applicant waived its appeal regarding the indefiniteness of the Class 41 services, this refusal is affirmed.

In the interest of completeness, we note the Examining Attorney's requirement that Applicant provide a sufficiently definite identification of services in Class 41 was appropriate. All applicants must provide "[a] list of the particular goods or services on or in connection with which the applicant uses or intends to use the mark." Trademark Rule 2.32(a)(6), 37 C.F.R. § 2.32(a)(6). The Examining Attorney argues,[43] and we agree, that Applicant's identification of services in Class 41 remains indefinite.

Applicant's sightseeing services could encompass transportation services in a different class, e.g., arranging of cruises or providing transport for sightseeing tours in Class 39. Applicant also does not define the nature of the additional services, i.e., "cultural activities" and "cruises."[44] We find that the identification remains indefinite because Applicant's identified services in Class 41: (i) include services that could be classified in more than one class, (ii) do not clarify the nature of the services with sufficient specificity, and (iii) do not allow the USPTO to properly understand the

---

[43] Examining Attorney's Brief, 8 TTABVUE 4-5.

[44] Applicant further duplicates the wording "arranging travel tours for others, namely,".

nature of the services for a potential substantive refusal purposes, such as a Trademark Act Section 2(d) refusal.

"The [US]PTO has discretion to determine whether and how a [service] mark registration should include a more particularized statement of the … [services] for which the mark is be used." *In re Omega SA*, 494 F.3d 1362, 83 USPQ2d 1541, 1544 (Fed. Cir. 2007) (affirming the refusal to register applicant's mark in Class 14 unless applicant amended its application to limit "chronographs" to "chronographs for use as watches.").

Because Applicant waived this issue by failing to present arguments at briefing, and because Applicant did not appropriately clarify the services identified in Class 41, we affirm the Examining Attorney's refusal to register Applicant's mark in that class.

**Decision:**

The refusal to register Applicant's FOLLOW THE LEADER mark under Trademark Act Sections 1, 2, 3, and 45 is reversed. The refusal to register Applicant's mark for the services in Class 41, because the services were not identified with requisite specificity, is affirmed. The Class 41 services will be deleted, and the Application will proceed with the services identified in Classes 35, 36, 39, 43, 44, and 45.